ATTORNEYS FOR APPELLANT
Robert K. Stanley
Kevin M. Toner
Kathy L. Osborn
Meg A. Gallmeyer
Indianapolis, Indiana

Eric M. Cavanaugh
Plainfield, Indiana

AMICUS CURIAE
INDIANA MANUFACTURERS ASSOCIATION
Knight S. Anderson
Keith J. Hays
Indianapolis, Indiana

AMICUS CURIAE
O'MALIA FOOD MARKETS, INC.
Jason L. Kennedy
Chicago, Illinois

ATTORNEYS FOR APPELLEES
Linda George
W. Russell Sipes
Indianapolis, Indiana

---

# In the
# Indiana Supreme Court

---

### No. 49S02-0405-CV-217

PSI ENERGY, INC.,

*Appellant (Defendant below),*

v.

WILLIAM LEE ROBERTS, JR., AND
BEVERLY ROBERTS,

*Appellees (Plaintiffs below).*

---

Appeal from the Marion Superior Court, No. 49D02-9601-MI-0001-687
The Honorable Kenneth H. Johnson, Judge

---

On Petition To Transfer from the Indiana Court of Appeals, No. 49A02-0210-CV-883

---

**June 28, 2005**

**Boehm, Justice.**

William Roberts contracted mesothelioma as a result of his work with asbestos-containing insulation as an employee of Armstrong Contracting and Supply Company (ACandS). Much of his work over a thirty-nine year career was at power generation facilities of PSI Energy, Inc. Roberts sued PSI and others on both vicarious liability and premises liability theories. A jury found PSI thirteen percent at fault without specifying which theory supported that result.

We hold that PSI is not vicariously liable for the negligence of its independent contractor ACandS. We also hold that as a general proposition a landowner or other possessor of real estate harboring a potentially dangerous condition is not liable to an independent contractor or its employees for injuries sustained by reason of the condition the contractor is employed to address. Under the circumstances of this case, however, there was sufficient evidence to support the jury's verdict in favor of Roberts and his wife under the premises liability instructions.

### Factual and Procedural Background

Roberts worked for ACandS as an insulator for most of his life. He started part-time in 1956, and worked full-time from 1957 through 1986 and from 1989 through 1991. He retired from full-time employment in 1992, but continued to work part-time until 1997. ACandS was the nation's largest insulation contractor over this period. Roberts worked with insulation containing asbestos from the time he started working in 1956 until his employer stopped using it in the early 1980s.

ACandS supplied its insulation services to a variety of industrial and other customers and assigned employees, including Roberts, to install and service insulation at a number of facilities. Roberts routinely installed, handled, removed, and otherwise worked directly with insulation containing asbestos. He knew that he was working with asbestos insulation and could recognize asbestos on sight. He estimated that over the course of his career he spent fifteen to eighteen years at various generating stations owned by PSI, the electric utility servicing a large part of Indiana.

In the late 1960s and into the 1970s, Roberts often worked at PSI's Dresser generating station. According to Roberts, the asbestos insulation at this station was in very poor condition,

"torn up," and "raggy." In performing his own work, Roberts was often exposed to asbestos, and he was also exposed to the material as the result of activities of PSI employees and other PSI contractors. Roberts and others who worked with him often had no protective clothing, masks, or respirators. PSI's corporate representative testified that he frequently saw ACandS's insulators working with asbestos at PSI plants in the 1960s and 1970s, but never saw them take any precautions to protect themselves from breathing asbestos dust.

A link between asbestos exposure and mesothelioma was established as early as the 1940s and 1950s. The evidence presented at trial indicated that ACandS was or should have been aware of asbestos-related health problems at least by the early 1960s. Roberts was a member of the Local 18 of Heat and Frost Insulators International and received its publications beginning in 1958. Articles in the union's magazines urged asbestos workers to use safety equipment, and "green sheets" included with the magazines from 1969 through 1976 discussed asbestos-related health problems. Roberts testified that he did not learn the true dangers of asbestos until the 1980s and that ACandS did not supply masks for the employees until the 1970s. He asserted that sometime in the 1970s, he noticed that asbestos products were being phased out, but no one told him it was for safety reasons.

Roberts was diagnosed with peritoneal mesothelioma in 2001.[1] In August of that year, he and his wife sued for Roberts's injury and for Mrs. Roberts's loss of consortium. They sought damages from PSI and sixty other defendants, including both manufacturers of asbestos and other landowners. As to the landowners, the complaint asserted both a premises liability theory and also that the Roberts's claims fell under exceptions to the general rule that a principal is not vicariously liable for the acts of ACandS, its independent contractor.

The case was tried to a jury on both counts. PSI objected to the trial court's instructions on the Roberts's theories of liability, and also moved for judgment on the evidence at the close of the Roberts's case and again at the close of all of the evidence. The trial court denied both motions and submitted the case to the jury. By this point in the trial, most defendants had settled

---

[1] The National Cancer Institute explains: "malignant mesothelioma, a rare form of cancer, is a disease in which cancer cells are found in the sac lining the chest, the lining of the abdominal cavity, or the lining around the heart." Most people with malignant mesothelioma contracted the disease while working in environments where they breathed asbestos fibers. Nat'l Cancer Institute, Mesothelioma, *at* http://www.mesotheliomaweb.org/mesothelioma.htm (last visited June 23, 2005).

and the only remaining defendants were PSI and three other premises owners, Eli Lilly, a pharmaceutical manufacturer, Central Soya, a food processor, and Kroger, a retail grocery chain. The jury returned a general verdict, finding compensatory damages of $2,800,000 for Roberts, who died after trial began, and $1,000,000 for Mrs. Roberts. The jury rejected the plaintiffs' claim for punitive damages. The jury allocated fault thirteen percent to PSI, twelve percent to Roberts, and none to the other three defendants. The remaining seventy-five percent was allocated to sixteen nonparties including thirty-six percent to ACandS. The trial court then entered judgment against PSI for $364,000 to Roberts and $130,000 to his wife. PSI appealed and the Court of Appeals held that PSI could be held liable as a premises defendant, and therefore affirmed the judgment based on a general judgment. PSI Energy, Inc., v. Roberts, 802 N.E.2d 468, 479 (Ind. Ct. App. 2004). This Court granted transfer. PSI v. Roberts, 812 N.E.2d 806 (Ind. 2004).

### Standard of Review

PSI challenges the denial of its motion for judgment on the evidence under Indiana Trial Rule 50 and the denial of its motion to correct error under Indiana Trial Rule 59. In reviewing a trial court's ruling on a motion for judgment on the evidence, the appellate court is to consider only the evidence and reasonable inferences most favorable to the non-moving party. Clark v. Wiegand, 617 N.E.2d 916, 918 (Ind. 1993). In considering a motion to correct error based on a claim of insufficient evidence, if the trial court determines that there is a total absence of evidence supporting a necessary element of the plaintiff's case the court should enter judgment for the defendant. State v. Emry, 753 N.E.2d 19, 21 (Ind. Ct. App. 2001). On the other hand, if there is some evidence to support the jury's verdict, the trial court must determine whether the jury's verdict is supported by sufficient evidence without weighing the evidence or judging the credibility of the witnesses. Id. Both rules mandate that the motion be granted when there is insufficient evidence under the law to support a verdict. Huff v. Travelers Indem. Co., 363 N.E.2d 985, 990 (Ind. 1977).

The jury returned a general verdict. PSI challenges the verdict arguing that the evidence is not sufficient to support it, but does not challenge the jury instructions on appeal. In this procedural posture, "a general verdict will be sustained if the evidence is sufficient to sustain any

theory of liability." Picadilly, Inc. v. Colvin, 519 N.E.2d 1217, 1221 (Ind. 1988) (citing In re Estate of Fanning, 263 Ind. 414, 417, 333 N.E.2d 80, 82 (1975); City of Indianapolis v. Pollard, 241 Ind. 66, 72, 169 N.E.2d 405, 408 (1960)).

## I. Vicarious Liability for Acts of ACandS

The parties agree that ACandS provided its services to PSI as an independent contractor. "The long-standing general rule has been that a principal is not liable for the negligence of an independent contractor." Carie v. PSI Energy, Inc., 715 N.E.2d 853, 855 (Ind. 1999). Indiana law recognizes five exceptions to this general rule, based on public policy concerns, which militate against permitting a principal to absolve itself of responsibility for some activities by conducting them through an independent contractor. Id. Roberts contended in the trial court that two of these exceptions applied here: (1) the "intrinsically dangerous" exception—"where the contract requires the performance of intrinsically dangerous work," and (2) the "due precaution" exception—"where the act will probably cause injury to others unless due precaution is taken." As is explained below, the trial court instructed on both theories. As Carie pointed out, the principal's liability in these exceptional situations is based on the idea that the principal "is in the best position to identify, minimize, and administer the risks involved in the contractor's activities." Id. Here, however, PSI contends with considerable force that it and the other owners of facilities containing asbestos were in no better position than ACandS to evaluate the risks inherent in working with insulation containing asbestos.

### A. *Liability of the Principal to the Independent Contractor or its Employees*

The term used to describe these exceptions—"nondelegable duty"—has historically been developed in the context of claims that the negligence of an independent contractor should be attributed to the principal. Dan B. Dobbs, The Law of Torts § 337, at 921-23 (2001). In that context, the Court of Appeals, following precedent in the majority of other states, had concluded in a number of cases that employees of the independent contractor could not invoke these exceptions to assert liability of the principal for acts of their employer as an independent contractor of the principal. Louisville Cement Co. v. Mumaw, 448 N.E.2d 1219, 1222 (Ind. Ct. App. 1983); Johns v. New York Blower Co., 442 N.E.2d 382, 386 (Ind. Ct. App. 1982); Hale v. Peabody Coal Co., 168 Ind. App. 336, 344, 343 N.E.2d 316, 324 (1976). If that doctrine is

5

followed in Indiana, it would preclude Roberts's claim against PSI to the extent it is based on negligence of ACandS in failing to provide adequate safeguards or because ACandS employees were thought to be engaged in inherently dangerous activities.

Roberts cites Bagley v. Insight Communications, Co., 658 N.E.2d 584, 587-88 (Ind. 1995), for the proposition that an employee of an independent contractor may recover from the principal for negligence of the contractor or a fellow employee of the contractor. Richard Bagley was an employee of Sam Friend, a subcontractor for a cable installer, Steve Crawford. Crawford, in turn, was acting as a subcontractor for Insight Communications, a central Indiana cable television company. Bagley was injured in the course of his work for Friend and brought suit against Insight, Friend, and Crawford arguing, among other things, that Insight and Crawford were negligent in hiring Friend as their subcontractor. This Court stated the issue before it as "may an independent contractor's employee, injured on the job as a result of the contractor's conduct, recover damages from a party who negligently hired the contractor, notwithstanding the general rule that one who uses an independent contractor will not be liable for the acts of that contractor?" Id. at 584. Negligent hiring focuses on the negligence of the principal in selecting the contractor. In contrast, the previously defined exceptions to the general rule of nonliability for negligence of an independent contractor had found the principal liable not for its own negligence, but for negligence of its contractor in carrying out a "nondelegable duty" of the principal. Bagley summarily affirmed the Court of Appeals in rejecting the claim that Insight or Crawford "had breached a duty to provide proper safety procedures" but went on to address "the negligent hiring issue." Id. at 586.

After acknowledging that some states and the Restatement (Second) of Torts § 411 (1965) permitted a claim for negligent hiring, the Court did not adopt that general doctrine under Indiana law. Rather, it held that liability for negligent selection of a contractor could be imposed under the same circumstances that were recognized as exceptions to the rule of nonliability for negligence of the contractor. Bagley, 658 N.E.2d at 587. This permitted a claim for "failure to exercise reasonable care to employ a competent and careful contractor" if the activity to be conducted fell within one of the five exceptions. Id. We thus have Indiana law under Bagley recognizing claims for failure to exercise care in the selection of a contractor under the same

circumstances as the law imposes potential liability for the actions of the contractor, even if carefully selected.

The Court then considered whether the negligent hiring claim could be asserted by an employee of the contractor. The Court noted the earlier line of decisions by the Court of Appeals that held that these five exceptions permitted only third parties, not the contractor or its employees, to assert the principal's liability for acts of the contractor.[2] Acknowledging these cases, the Bagley court held "such restriction of the exceptions to exclude injured workers is contrary to the purpose of the exceptions and is not compelled by their underlying policy concerns." Id. at 588. The Court stated, "our objective is no less to protect workers who may be exposed to such risks than it is to protect non-employee third parties. . . . Where a contractor's employer is responsible for a non-delegable duty, the contractor's injured worker should not discriminately be deprived of access to full compensatory damages but should have recourse equal to that of an injured bystander." Id. The Court found Bagley's negligent hiring claim to fit the exception for acts to be performed by the independent contractor that will probably cause injury to others unless "due precaution" is taken. So viewed, Bagley's claim failed because Bagley was injured when a fellow employee slipped and fell on him from a ladder while he was driving a stake in the ground. There was no probability that injury would occur from his work, which consisted of simply driving a stake into the ground and no customary precautions were

---

[2] For example, Hale involved an employee of a subcontractor hired to construct coal-handling facilities at the principal's coal mine who fell from a broken scaffolding. 168 Ind. App. at 337, 343 N.E.2d at 319. The employee claimed that the coal mine was liable because working with scaffolding is intrinsically dangerous. The court held that the work was not intrinsically dangerous, but also noted in a footnote that "there is a significant body of case law from other states holding this exception inapplicable to servants of independent contractors." Id. at 343, 322 n.1. Although the Hale footnote was dicta, it was soon followed as the basis of decision. In Louisville Cement Co., an employee of an independent contractor was injured while using an oxygen propane-cutting torch to cut pipes that the general contractor, a cement company, had prepared for the work. 448 N.E.2d at 1220. The pipes had contained diesel fuel and had been drained by the cement company. Among other things, the employee argued that the cement company should be liable because it failed to repair the latent defect in the pipes that caused his injury and that this was a nondelegable duty. The court reasoned that the only exception that could apply to this situation was the exception for acts that will probably cause injury to others unless due precaution is taken. Id. at 1222. Citing Hale, the court held that the exception did not apply because "injury to others" does not embrace injuries to employees of the independent contractor. Id. In Johns, an employee of an independent contractor working as an ironworker fell from a steel beam that had no safety net. 442 N.E.2d at 383. The court held that the work was not intrinsically dangerous but also expressed the view that "the liability of a contractee/owner under the inherently dangerous work exception does not extend to employees of the independent contractor performing the work." Id. at 386.

omitted. Accordingly, the requirements of this exception were not met. It was therefore unnecessary for <u>Bagley</u> to address whether the other defendants were negligent in selecting Bagley's employer.

Because it addressed a negligent hiring claim, <u>Bagley</u> did not directly address the question whether an employee of an independent contractor may recover from the principal for the negligence of the contractor without any negligence of the principal in selecting the contractor. The language in <u>Bagley</u>, though directly addressing only negligent hiring requiring negligence of the principal, may fairly be read to apply to liability for acts of the contractor under the five exceptions. However, <u>Bagley</u> did not face the issue of a claim by a worker injured by the very condition the worker's employer was contracted to address. That is essentially what Roberts asserts here.

Hiring of independent contractors to do work that may be described as "probable" to cause injury unless "due precautions" are taken occurs frequently in a technologically advanced society. If the principal has knowledge of some undisclosed risk factor not known to the contractor, there may be liability for failure to alert the contractor. <u>See</u> <u>Restatement (Second) of Torts</u>, § 343. Similarly, as <u>Bagley</u> held, at least under some circumstances, negligent selection of a contractor may expose a principal to liability. But if the law imposed on the principal liability for failure to supervise or monitor the contractor's activities, the result is added cost for minimal benefit. We think that to the extent an independent contractor is employed to redress or correct a problem for the principal, even if the contractor's activity may be viewed as either intrinsically dangerous or may require precautions, employees of the contractor have no claim against the principal based solely on either acts of the contractor or the condition to be remedied, or some combination of both. The contractor is presumably best equipped to evaluate the necessary precautions and determine the standard of ordinary care. <u>See</u> <u>Peone v. Regulus Stud Mills</u>, 744 P.2d 102, 107 (Idaho 1987) (logging contractor is in a better position than a sawmill operator to assess the risks of falling trees); <u>Restatement (Second) of Torts</u> § 413, cmt. b. Employees of the contractor should have no claim against a principal for their own or the contractor's failure to use ordinary care in carrying out the contractor's assignment. Nor should a principal be liable to a contractor or its employees simply by reason of employing the contractor to engage in inherently dangerous activity. We hold therefore that in the absence of negligent selection of the

8

contractor, an employee of the contractor has no claim against the principal based solely on the five exceptions to the general rule of nonliability for acts of the contractor.

B. *Liability for "Intrinsically Dangerous" Activities*

We also agree with PSI that recovery under the inherently dangerous exception was not supported by the evidence. The jury was instructed that:

> the law imposes a duty on a landowner[3] if the work to be performed is intrinsically dangerous. Work is "intrinsically dangerous" if the danger exists in the doing of the activity regardless of the method used. The work is intrinsically dangerous if the risk of injury cannot be eliminated or significantly reduced by taking proper precautions.

Roberts argues that when he worked at PSI, he performed intrinsically dangerous work that is not delegable to an independent contractor. PSI does not challenge this instruction as an accurate statement of the law. Rather, PSI contends the evidence does not support the verdict.

For the reasons given in Part D below, Roberts is not estopped from arguing that working with asbestos was intrinsically dangerous despite his simultaneous contention that PSI is liable for failure of ACandS to take due precautions to avoid the injury. We conclude, however, that the evidence does not support recovery on this theory. "The term 'inherently or intrinsically dangerous' has been defined as work necessarily attended with danger, no matter how skillfully or carefully it is performed." 41 Am. Jur. 2d Independent Contractors § 54 (1995); see Shell Oil Co. v. Meyer, 705 N.E.2d 962, 978 (Ind. 1998) (work is intrinsically dangerous if the danger exists in the doing of the activity regardless of the method used). Unlike the other four exceptions to the nonliability of the principal, the "inherently dangerous" exception is normally associated with strict liability and does not require negligence on the part of the contractor. Dobbs, supra § 337, at 921. It imposes liability for activities that are dangerous by nature, not merely because they are carried out in a risky manner. For example, if the enterprise hires an independent contractor to dust crops with poison, it is liable for damage to neighbors' crops without regard to negligence. Id.

---

[3]Although this instruction is phrased in terms of the duty of a "landowner" it was given as an instruction on a principal's liability for acts of an independent contractor. The principals in this case, including PSI, happened to be landowners who employed ACandS, and therefore Roberts, on their premises.

9

Roberts asserts that asbestos itself is intrinsically dangerous and "any work that causes inherently dangerous fibers to enter the breathing space of humans is intrinsically dangerous work." He points to Covalt v. Carey Canada, Inc., 543 N.E.2d 382 (Ind. 1989), in which this Court described asbestos fibers as "an inherently dangerous substance . . . a toxic foreign substance . . . an inherently dangerous product . . . and a hazardous foreign substance." Id. at 384-86. Roberts asserts that there is nothing that can make asbestos fibers safe. PSI responds that although asbestos may be an inherently dangerous substance, it does not follow that working with material containing asbestos is intrinsically dangerous work. PSI asserts that the evidence at trial demonstrates that the dangers of working with asbestos could have been minimized if Roberts had taken proper precautions. Roberts himself asserted liability based on the failure to use "due precautions" exception discussed in Part I.C. This assumes that injury can be significantly reduced and, as PSI points out, is inconsistent with the claim that the work is inherently dangerous. Dr. Michael Ellenbecker, an industrial hygiene expert called by Roberts, testified to the methods available at the time Roberts was exposed to asbestos that could have been employed to reduce his exposure. He described the possibility of substituting other insulation materials for asbestos, the practice of isolating the asbestos fibers, and other control and prevention measures. Dr. Ellenbecker testified "it's possible to perform an installation where the hazards are minimized, but when we're talking about mesothelioma, I think it's difficult to do any activities with asbestos where you completely eliminate the hazard." Roberts argues that this testimony shows that performing asbestos work is an intrinsically dangerous activity because mesothelioma can be caused by very small exposures to asbestos. He reasons that because asbestos-related diseases are often terminal and can be caused by very small exposures, it follows that working with asbestos is intrinsically dangerous.

We agree that working with asbestos can be perilous, but that is not enough to render it intrinsically dangerous as that term is used to establish liability for actions of an independent contractor. For example in McDaniel v. Business Investment Group, Ltd., 709 N.E.2d 17 (Ind. Ct. App. 1999) trans. denied, an employee working on a sewer line in a 9 foot deep trench was killed when the sides of the trench caved in. The Indiana Court of Appeals held that trenching is not intrinsically dangerous work because "although it can be dangerous, the use of proper procedures . . . renders the work relatively safe." Id. at 21. Roberts asserts that whether the danger from asbestos work could have been significantly reduced is itself a question of fact for

the jury. If proper precautions can minimize the risk of injury, then the activity is not intrinsically dangerous. See Carie v. PSI Energy, Inc., 694 N.E.2d 729, 735 (Ind. Ct. App. 1998), affirmed in part and vacated in part by, Carie v. PSI Energy, Inc., 715 N.E.2d 853 (Ind. 1999) (quoting Denneau v. Ind. & Mich. Elec. Co, 150 Ind. App. 615, 620, 277 N.E.2d 8, 12 (1971)). Here, it seems agreed by all that precautions could have minimized Roberts's exposure to asbestos. Indeed, as explained below, this was the premise of one of Roberts's principal theories of liability. Therefore, we conclude that working with asbestos is not intrinsically dangerous such that anyone hiring a contractor to address it incurs strict liability for injuries sustained from exposure to it. For this second and independent reason, Roberts's claim fails under the independent contractor liability theory. We also recognize, as the dissent points out, that the consequences of mesothelioma can be horrific. But that does not render asbestos intrinsically dangerous. The same is true of electricity and a number of other substances that, if mishandled, can be dangerous.

### C. *Due Precaution*

Roberts contends that PSI could have been found liable for his injuries under the "due precaution" exception to the general rule of non-liability for acts of independent contractors. Sometimes referred to as the "peculiar risk" doctrine, this exception imposes liability on a principal where the act to be performed will "probably" cause injury to others unless due precaution is taken. Carie, 715 N.E.2d at 856; Bagley, 658 N.E.2d at 586. This exception requires that, at the time of engaging the contractor, the principal should have foreseen that the performance of the work or the conditions under which it was to be performed would, absent precautionary measures, probably cause injury. Carie, 715 N.E.2d at 856; McDaniel, 709 N.E.2d at 22. Application of this exception therefore depends on the probability of injury from the risk and its foreseeability by the principal. This doctrine does not render the principal liable for the contractor's failure to take normal precautions incident to the activity to be carried out. Thus, a homeowner has no liability for an electrician's failure to take the normal precaution of breaking a circuit before touching the wiring. The McDaniel court explained, "the exception applies only when the risk involved is something more than the routine and predictable hazards generally associated with a given occupation: it must be a risk unique to the circumstances of a given job." 709 N.E.2d at 22. "It is not concerned with taking routine precautions, of a kind which any

careful contractor could reasonably be expected to take, against all of the ordinary and customary dangers which may arise in the course of the contemplated work. Such precautions are the responsibility of the contractor." Restatement (Second) of Torts, § 413 cmt. b.

The trial court instructed,

> the law imposes a duty on a landowner [read "principal"] if the work to be performed will probably cause injury to others unless due precautions are taken to avoid harm. The essence of this exception is the foreseeability of both the peculiar risk involved in the work and the need for special precautions. For purposes of this exception, the phrase 'peculiar risk' refers to the risk of a particularized harm specific to the work being performed or the conditions under which it is performed. Moreover, the exception applies only when the risk involved is something more than the routine and predictable hazards generally associated with a given occupation: it must be a risk unique to the circumstances of a given job.

PSI argues that exposure to asbestos materials at PSI job sites did not present a "peculiar risk" to an asbestos worker who worked with and around asbestos materials on a daily basis in the normal course of his trade. PSI points out that mesothelioma and other asbestos-related diseases are much more common in asbestos workers than in the general population. PSI contends these disorders are therefore "routine and predictable" hazards of asbestos insulation work. Roberts counters that mesothelioma has a very long latency period and Roberts did not know the danger at the time, so the danger in working with asbestos was neither routine nor predictable. Roberts's claim thus seeks to embrace the unforeseeability of the risk and at the same time attribute to PSI liability for failing to foresee it. We think that absent unusual circumstances at a given workplace, industry standards are applicable measures of the "routine precautions" that are the responsibility of the contractor, and injuries or disorders that are usual to a given occupation are not within the "due precaution" exception. McDaniel, 709 N.E.2d at 23.

Roberts argues that even if unusual risk is required, PSI meets that test because his exposure to asbestos was more severe at PSI sites than at other jobsites and therefore working at PSI created a peculiar risk. PSI counters that there is no evidence that working at PSI involved risks unique or distinguishable from the general risk Roberts faced on a daily basis in the normal course of his profession. Roberts did the majority of his work on PSI property. He points to the

duration, intensity, and volume of asbestos at PSI as unique, and argues that the high heat at PSI caused him not to wear a mask. He also points to evidence that PSI's workers kicked up dust, and that the asbestos insulation at PSI was in worse condition than that at other locations.

We do not believe these facts establish that PSI created unusual risks as applied to an insulator. They establish at most a higher incidence of qualitatively identical hazards. And it is clear that working with any level of asbestos can be associated with mesothelioma. As we recently observed "the normal, expected use of asbestos products entails contact with its migrating and potentially harmful residue." Stegemoller v. ACandS, Inc., 767 N.E.2d 974, 976 (Ind. 2002). In sum, the record is undisputed that wherever Roberts may have worked as an insulation contractor, the risk was the same—that of breathing asbestos fibers and contracting mesothelioma. At most, PSI created a quantitatively higher risk, but not a risk unique to PSI, and not a risk requiring qualitatively different precautions from those generally associated with asbestos.

D. *Judicial Estoppel*

PSI asserts that because Roberts argued at trial that his illness could have been prevented with the use of available safety precautions, he is now judicially estopped from arguing that asbestos work is intrinsically dangerous. "Judicial estoppel 'prevents a party from asserting a position in a legal proceeding inconsistent with one previously asserted.'" Meridian Ins. Co. v Zepeda, 734 N.E.2d 1126, 1133 (Ind. Ct. App. 2000) (quoting Wabash Grain, Inc. v. Smith, 700 N.E.2d 234, 237 (Ind. Ct. App. 1998), trans. denied. A party may properly plead alternative and contradictory theories, but judicial estoppel precludes a party from repudiating assertions in the party's own pleadings. Marquez v. Mayer, 727 N.E.2d 768, 773 (Ind. Ct. App. 2000), trans. denied. Because application of the intrinsically dangerous exception requires a showing that the risk created by the work could not be prevented or minimized, PSI says, "having prevailed on the theory that Roberts's illness could have been prevented through the use of available industrial hygiene techniques, Roberts is estopped from arguing on appeal that his illness was not preventable." Roberts counters that he argued that his disease could have been prevented by substitution of non-hazardous insulation for asbestos insulation. If this had been done, Roberts argues that he would not have been engaged in intrinsically dangerous work because he would

13

not have been working with asbestos. We agree that Roberts is not precluded from arguing that working with asbestos is intrinsically dangerous and that his disease could have been prevented by substitution of another insulating material. PSI did not argue in the trial court that Roberts was judicially estopped from presenting this theory and does not object on appeal to the instructions to the jury on the intrinsically dangerous exception. PSI argued in objecting to the jury instructions on "intrinsically dangerous" that "it is the entire theory of plaintiffs' case that plaintiffs' disease could have been prevented." We think the trial court could fairly take this as an objection that the instruction is not supported by the evidence.

E. *Conclusion as to Liability for Actions of an Independent Contractor*

In sum, Roberts has no claim against PSI for activities of ACandS as PSI's independent contractor because (a) the injuries he suffered came from a situation he was employed to address, (b) asbestos is not "inherently dangerous" as that term is used in the exception to nonliability for acts of independent contractors, and (c) the injuries he sustained are common among workers in his industry and the necessary precautions he identified are the responsibility of his employer, not PSI.

## II. Premises Liability

Roberts argues that PSI can be held liable for his injuries because Roberts was PSI's business invitee and PSI breached its duty of care as a landowner. As a general rule, a property owner has no duty to furnish the employees of an independent contractor a safe place to work, at least as that duty is imposed on employers. Merrill v. Knauf Fiber Glass, GmbH, 771 N.E.2d 1258, 1264 (Ind. Ct. App. 2002), trans. denied. The property owner must however maintain the property in reasonably safe condition for business invitees including independent contractors and their employees. Indiana has adopted the Restatement (Second) of Torts formulation of landowners' liability to workers on the premises. Douglass v. Irvin, 549 N.E.2d 368, 370 (Ind. 1990). As the Restatement (Second) of Torts explains:

> A possessor of land is subject to liability for physical harm caused to his invitees
> by a condition on the land if, but only if, he
> (a) knows or by the exercise of reasonable care would discover the condition, and
> should realize that it involves an unreasonable risk of harm to such invitees, and
> (b) should expect that they will not discover or realize the danger, or will fail to

14

protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts, § 343. Further, section 343A(1), which is meant to be read in conjunction with section 343, provides, "a possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." For the reasons given below, we conclude that the jury could have found that PSI failed to maintain its property in a reasonably safe condition.

In the vast majority of premises liability cases, the plaintiff is either a guest or a customer of the possessor of the premises. There are a few reported cases where the plaintiff is an employee of an independent contractor, but in every one of those, the "condition" or "activity" that gives rise to liability is a condition not created or addressed by the contractor (a preexisting hole in the roof) or an activity conducted by somebody other than the plaintiff or the plaintiff's employer (demolition work by another contractor). Here, liability is premised on the condition (asbestos on the site) or activity (removing or installing asbestos) that was the reason for the plaintiff's presence on the property. The early cases on landowner liability recognized that a dangerous condition did not give rise to liability to the person hired to "repair" it. Annotation, *Duty of Owner of Premises to Furnish Independent Contractor or His Employee a Safe Place to Work, Where Contract is for Repairs*, 31 A.L.R. 2d 1375 (1953). Premises liability to insulators based solely on their exposure to insulation on the premises thus would present an extension of existing case law in this jurisdiction, and so far as we can determine, everywhere else as well. PSI and amici posit that this extension would affect a large number of landowners who find themselves with asbestos on site that either has required or will require services of professional installers or removers.

Roberts correctly points out that the Restatement, if taken literally, supports his claim. He asserts injury from a "condition" (asbestos) on PSI's land which at least at some point PSI "should realize" constitutes an "unreasonable risk" if no precautions are taken. There was evidence that PSI was aware that ACandS workers took no precautions. However, we do not believe the language of the Restatement was framed in contemplation of claims by those conducting the dangerous activity or addressing the "condition." All of the Restatement's

15

illustrations address fact situations in which the claimant is a guest or customer, not a person on the premises to remedy the "condition." A Restatement is just that, an attempt to formulate what decisional law is or ought to be. It is not a statute whose precise wording is entitled to deference as an act of an equal branch of government. Harold G. Maier, *The Utilitarian Role of a Restatement of Conflicts in a Common Law System: How Much Judicial Deference Is Due to the Restaters or "Who are these guys, anyway?"*, 75 Ind. L.J. 541, 548 (2000). In interpreting and applying a Restatement, it is often necessary to consider the illustrations and cases applying it and the theories underlying them.

This case is an example of the intersection of two theories of common law liability. PSI employed ACandS as an independent contractor to deal with asbestos insulation installed on PSI's power generating structures. The plaintiffs assert that PSI incurred liability to Roberts both as the entity in possession of the premises and as a principal liable for the acts of its independent contractor. In considering landowner liability to an independent contractor or its employees, the considerations limiting the principal's liability for acts of the contractor are also relevant to the principal's liability as a landowner. For the reasons given in Part I, the appropriateness of safeguards by employees of a contractor is reasonably left to the contractors. Viewed through that lens, we do not believe the law supports Roberts's claim to the extent it is based on PSI's knowledge of asbestos on the property and awareness that ACandS was not requiring safeguards.

A. *Knowledge of the Dangers*

PSI challenges the jury verdict based on subsection (b) of section 343 of the Restatement (Second) of Torts. As this subsection makes clear, PSI is liable for Roberts's injuries only if PSI should have foreseen that Roberts would fail to protect himself. Davis v. Hoosier Energy Rural Elec. Coop., Inc., 19 F.3d 365, 369 (7th Cir. 1994). In analyzing whether a landowner should have expected an injury and therefore breached its duty to an invitee, a court will consider the purpose and intent of the invitation and the relative knowledge of the parties. Merrill, 771 N.E.2d at 1265. "The determination of whether a breach of duty occurred is a factual question requiring an evaluation of the landowner's conduct with respect to the requisite standard of care. In this factual assessment the issue of the landowner's and the invitee's comparative knowledge

becomes relevant." Douglass, 549 N.E.2d at 369-70. "Facts showing only that a landowner knows of a condition involving a risk of harm to an invitee, but could reasonably expect the invitee to discover, realize, and avoid such risk, may be insufficient to prove breach of the duty." Id. at 370. We think a landowner who employs a contractor to perform specialized work such as insulation installation or removal is entitled to rely on the contractor to comply with appropriate safety standards. Indeed, as PSI points out, the contractor is obligated by law to "furnish employment that is safe," "furnish and use safety devices, safeguards, methods, and processes reasonably adequate to render employment and place of employment safe," and "do every other thing reasonably necessary to protect the safety of the employee." Ind. Code § 22-1-1-10 (2004).

The Court of Appeals concluded that there was sufficient evidence for the jury to conclude that PSI breached its duty, finding "that (1) the danger was not known or obvious to Roberts; and (2) PSI should have anticipated the harm." PSI Energy, Inc. v. Roberts, 802 N.E.2d 468, 477 (Ind. Ct. App. 2004). This formulation compares the knowledge of the landowner (PSI) to that of the employee (Roberts) of the independent contractor, rather than that of the independent contractor (ACandS). We think this element of liability turns on the knowledge of the independent contractor, not the contractor's employee. In Merrill, Knauf hired Ellerman Roofing to repair its roof. Merrill, an Ellerman employee, was injured when he fell through a skylight in Knauf's roof. 771 N.E.2d at 1262. The court reasoned that Knauf would be liable for Merrill's injuries only if it should have anticipated that Merrill would fail to protect himself despite his knowledge of the danger and if, despite this anticipation, Knauf failed to exercise reasonable care to protect Merrill. Id. at 1265. The court pointed out that Ellerman was a professional roofing company and was in control of the manner in which the roof was to be prepared. Id. Because Knauf had warned the independent contractor of the danger of the skylight, the court held that Knauf could not be held liable. Id. The court reasoned, "the warnings to Merrill's superiors were warnings to Merrill, 'the employment relation permitting a reasonable assumption that such notice will be communicated in the ordinary course to all employees on the work.'" Id. (quoting Howard v. H.J. Ricks Constr. Co., 509 N.E.2d 201, 205-06 (Ind. Ct. App. 1987)). Just as the warnings to Merrill's supervisors constituted warnings to Merrill, ACandS's knowledge of the dangers of asbestos can be imputed to Roberts. See Moloso v. State, 644 P.2d 205, 220 (Alaska 1982). If the individual knowledge of each employee were the test, landowners would be required to monitor the performance of independent contractors

17

working on their property.  Once again we are faced with a theory that would impose an additional cost on every project to little benefit because the contractor is presumably in the best position to evaluate what precautions are necessary.  It would also diffuse the contractor's responsibility over an area in which the contractor is presumably the expert.  We conclude that ACandS was employed to work with PSI's insulation.  Its knowledge is the relevant benchmark here, not Roberts's.

Unless the landowner has unique knowledge not imparted to the independent contractor, the owner should have no liability to employees of the independent contractor based on a claim that the project is unusually risky or dangerous.  Landowners often hire independent contractors to take advantage of the special skill or knowledge the contractor possesses.  In assessing the comparative knowledge of the parties involved, the focus of the inquiry is upon whether the landowner had superior knowledge with regard to any danger on the premises.  Armstrong v. Cerestar USA, Inc., 775 N.E.2d 360, 372 (Ind. Ct. App. 2002), trans. denied.  Although the record shows awareness on the part of PSI, ACandS, and Roberts himself of the dangers in handling asbestos, there is no evidence that PSI possessed superior knowledge to ACandS in this respect.

B. *Restatement section 343A*

The Restatement states that a landowner "is not liable . . . unless" it should anticipate harm.  Restatement (Second) of Torts, § 343A.  Even though an independent contractor who is an invitee may have equal or superior knowledge of the dangers on the premises, this language from the Restatement can be read to imply that a possessor of land may be liable to his invitees for physical harm caused to them if "the possessor should anticipate the harm despite such knowledge or obviousness."  Restatement (Second) of Torts, § 343A.  Comment f to this section explains that when the landowner should anticipate that the dangerous condition would cause physical harm to the invitee notwithstanding its known or obvious danger, the possessor is not relieved of the duty of reasonable care which he owes to the invitee.  Id. cmt f.  "This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm."  Id.

18

PSI's corporate representative testified that he frequently saw ACandS's insulators performing work at the PSI plants in the 1960s and 1970s and never saw the employees taking any precautions to protect themselves from breathing the asbestos insulation. There was testimony that senior members of PSI's management were present while contractors from ACandS worked on insulation. The Court of Appeals reasoned that "PSI cannot continue to rely on what might have been a reasonable expectation at the outset where activities inconsistent with that expectation continued for a number of years." PSI Energy, Inc., 802 N.E.2d at 477. PSI responds that it was entitled to assume from the fact that ACandS workers wore no masks that these "skilled tradesmen" had determined that masks were not necessary. We agree that landowners often hire independent contractors with the understanding that those contractors possess better tools and skills to perform the work than the landowner and therefore the landowner may rely on those skills. This is one of the basic principles underlying the general rule of non-liability and applies in most instances involving a principal who hires an independent contractor.

As we observed in Carie with respect to the "due precaution" exception to the general rule of nonliability for acts of independent contractors, the principal's liability is predicated on the principal's superior familiarity with the risks. A principal who hires an independent contractor to address a problem on the principal's premises is no different from one who engages a contractor for work elsewhere and should have no broader exposure to liability for the contractor's acts. As applied to impose liability on a landowner for a contractor's omission, imposition of liability for something equally known as the contractor amounts to a backdoor expansion of liability for the contractor's actions. No case has found the duty to take "reasonable steps" to impose on the landlord an obligation to see that a contractor uses appropriate safety equipment.[4] We think that "reasonable steps" do not extend to, in effect,

---

[4] The closest we find to an exception is Martin v. Chicago Housing Authority, 637 N.E.2d 506 (Ill. App. Ct. 1994). An elevator repairman was injured while performing emergency maintenance on the elevator in one of the Housing Authority's buildings. He was instructed that the elevator was "down" and that he should get it operating. Id. at 509. In the course of his repair work, the repairman had to stand on the roof of the elevator and direct its movements using control switches on the top of the elevator. Id. These controls malfunctioned, causing his injuries. Id. at 510. Citing Illinois Supreme Court cases holding that landowners are not liable to police officers or firemen for injuries normally associated with their jobs, the Housing Authority argued that any risks posed by conditions which bring a worker onto a landowner's premises are risks which are inherent in the worker's job, and as such are not unreasonable risks imposing

supervision of the independent contractor's activities. Accordingly, failure to take that action is not a breach of the landowner's standard of care. For that reason, we hold that a landowner ordinarily has no liability to an independent contractor or the contractor's employees for injuries sustained while addressing a condition as to which the landowner has no superior knowledge.

C. *The Jury Instructions in this Case*

In this case, the jury was instructed that:

> A landowner has a common law duty to exercise due care to keep its property in a reasonably safe condition for employees of independent contractors. The landowner in such case has an affirmative duty to exercise ordinary care to keep its property in a reasonably safe condition consistent with the purpose of the landowner's invitation to the independent contractor.
> In this case, a landowner would be liable for physical harm caused to Mr. Roberts, by a condition on its property, if Plaintiffs prove each of the following:
> (a) The landowner knew or by the exercise of reasonable care should have discovered the condition, and should have realized that it involved an unreasonable risk of harm to Mr. Roberts;
> (b) The landowner should have expected that Mr. Roberts would not discover or realize the danger, or would fail to protect himself against it;
> (c) The landowner failed to exercise reasonable care to protect Mr. Roberts against the danger; and
> (d) The Landowners' breach proximately caused Mr. Roberts's disease.

PSI appeals solely on the ground that the evidence was insufficient to support liability. As the foregoing discussion makes apparent, this instruction is not an accurate statement of the law in that it allows liability to an independent contractor's employee to be imposed upon a landowner when the employee is addressing a condition as to which the landowner has no superior knowledge. It also would permit liability for failure to correct the contractor's omissions in safety precautions.

This instruction is, with immaterial editorial changes, taken from the <u>Restatement (Second) of Torts</u> § 343 (1965), which was expressly approved by this Court in <u>Burrell v. Meads</u>, 569 N.E.2d 637, 643 (1991). PSI and every other defendant understandably did not challenge

---

a duty upon the landowner. <u>Id.</u> at 518. The court disagreed and held that Martin was injured as a result of the unreasonably dangerous condition of the elevator brought about by the Housing Authority's failure to adequately inspect and maintain it. <u>Id.</u> However, in <u>Martin</u> the plaintiff was hired to repair the elevator itself, not the control switches which were the cause of his injury.

this instruction at trial and PSI raises no issue as to it on appeal.  Nor does PSI raise an issue as to a rejected instruction.  Even erroneous instructions require affirmance if there is no objection at trial and the facts support recovery under the instructions.  <u>Piccadilly, Inc. v. Colvin</u>, 519 N.E.2d 1217, 1221 (Ind. 1988); Ind. Trial Rule 51(C).  The record includes evidence that at least by the 1970s hazards from asbestos exposure were identified and known to PSI.  ACandS employees were nevertheless unproctected on the site.  On this record, the jury could find that PSI met all of the conditions:  PSI had knowledge of the hazard, knew ACandS employees were taking no action to protect themselves, and did nothing.  These facts would be sufficient under these instructions to sustain the jury's verdict.  Indeed, these unusual facts may well be reflected in the jury's verdict in which the other three defendant landowners were found without fault.

## Conclusion

Because the jury returned a general verdict, and the evidence most favorable to the verdict supported one of the two counts, the judgment of the trial court is affirmed.


Shepard, C.J., and Sullivan, J. concur.

Dickson, J., concurs in result and dissents with separate opinion in which Rucker, J., concurs.

**Dickson, Justice, concurring in result and dissenting.**

I concur with the majority's affirmance of the trial court judgment. But I dissent from the majority's general discussion regarding the responsibility of a principal or landowner for injuries suffered by workers employed by an independent contractor hired by the landowner or principal. In an apparent effort to provide protection for landowners and other entities that employ independent contractors to eliminate or ameliorate dangerous conditions, the Court's opinion, in my judgment, goes too far and represents a significant departure from important principles of Indiana construction safety law.

The majority opinion for the Court is divided into two parts, with part I referring to PSI's vicarious liability for the acts of ACandS, and part II addressing PSI's direct liability as possessor of the premises for the conditions that caused Roberts's injuries.

In part I, the Court addresses the vicarious liability of PSI for the acts of ACandS. In this part the Court notes that there are five exceptions to the general rule of nonliability for injuries resulting from actions of independent contractors, but focuses upon the two raised by Roberts: (1) the "intrinsically dangerous" exception, and (2) the "due precaution" exception.

In part I-A, the Court acknowledges the reasoning and holding in Bagley v. Insight Communications Co., 658 N.E.2d 584, 587-88 (Ind. 1995), which stated:

> Our objective is no less to protect workers who may be exposed to such risks than it is to protect non-employee third parties. . . . Where a contractor's employer is responsible for a non-delegable duty, the contractor's injured worker should not discriminately be deprived of access to full compensatory damages but should have recourse equal to that of an injured bystander.

Id. at 588. And the Court correctly observes that this language "may fairly be read to apply to liability for acts of the contractor under the five exceptions." Slip op. at 8.

But the Court then proceeds to hold the opposite, broadly declaring that "in the absence of negligent selection of the contractor, an employee of the contractor has no claim against the principal based solely on the five exceptions to the general rule of nonliability for acts of the

22

contractor." *Id*. at 8-9. I disagree and believe our precedent in <u>Bagley</u> should control. I understand the Court's focus today to be generally that of shielding principals from liability for the actions of independent contractors employed to eliminate or ameliorate hazardous conditions. Discarding <u>Bagley</u>, however, is an unnecessarily broad stroke to accomplish this objective, which I believe to be generally attainable under existing law.

In part I-B, the Court concludes that "working with asbestos is not intrinsically dangerous such that anyone hiring a contractor to address it incurs strict liability for injuries sustained from exposure to it." *Id*. at 11. I strongly disagree with this assertion, believing that asbestos is precisely the sort of danger to which the intrinsically dangerous exception should apply.

This principle is expressed in Restatement of Torts, Second § 427 A: "One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity, is subject to liability to the same extent as the contractor for physical harm to others caused by the activity." The underlying purpose of this rule is that:

> [O]ne who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity cannot be permitted to escape the responsibility for the abnormal danger created by the activity which he has set in motion, and so cannot delegate the responsibility for harm resulting to others to the contractor.

Comment *b* to § 427 A. The illustrations following § 427 refer to injuries resulting from the non-negligent escape of lions and urban blasting operations as examples of abnormally dangerous activities.

As acknowledged by the Court, we have previously described asbestos fibers as "an inherently dangerous substance . . . a toxic foreign substance . . . an inherently dangerous product . . . and a hazardous foreign substance." Slip op. at 10, quoting <u>Covalt v. Carey Canada, Inc.</u>, 543 N.E.2d 382, 384-86 (Ind. 1989). We have likewise noted that "[t]he normal, expected use of asbestos products entails contact with its migrating and potentially harmful residue." <u>Stegemoller v. ACandS, Inc.</u>, 767 N.E.2d 974 (Ind. 2003) (allowing action as a products liability act "bystander" by spouse contracting disease as result of contact with asbestos fibers brought home on the person and clothing of husband, a union insulator).

23

Dr. David Mares, who diagnosed the plaintiff's peritoneal mesothelioma, stated that, without a doubt, "it was caused by asbestos exposure." Trans. at 1208. Dr. Mares also provided vivid testimony describing the disease's deadly nature. He declared that malignant mesothelioma is a fatal disease process. "It is not curable." Trans. at 1196. The time from the date of diagnosis to the date of death in a person with malignant peritoneal mesothelioma is usually "a year or less." Trans. at 1206. Dr. Mares explained:

> There are several possible ways that Mr. Roberts can be involved with this disease process. The first being recurrent accumulation of fluid in the abdomen that needs to be taken off with this [tapping] procedure . . . That can be, of course, painful and limiting to one's life, to have to be tied to the hospital . . . That's kind of the early progress of the disease . . . Another way could be that . . . the tumor itself tends to form less fluid and would instead progress by growing within the abdomen, causing pain by growth into any of the vital structures, such as the umbilical pain . . . It can grow into the muscle layers. It can grow into the bones of the back . . . [or] into the vital organs. This causes a tremendous amount of pain. The kind of pain that would require continuous infusion of medicines to control . . . [T]he third possibility would be that the intestines become enveloped and, in a sense, strangulated by the tumor such that he would be unable to eat, unable to even swallow anything, and the body's own natural secretions would build up in the body. It would be the bowel obstruction pattern, where he would continuously vomit, require tubes to drain his stomach contents and his stomach's own secretions . . . And that, I feel, in combination with the pain is the most horrible way one can die of mesothelioma.

Trans. at 1203-05. Dr. Mares pointed out that Mr. Roberts's pain will be "uncontrollable" and "unbearable" and that the "best medications will not provide pain relief." Trans. at 1220.

Describing the nature of mesothelioma, pathologist Arnold R. Brody, Ph.D., explained: "Our peritoneal cavity is where some of our organs are, like the stomach and the liver and the spleen sit in the peritoneal cavity. And that is lined by a single layer of cells, the mesothelium . . . And when there is cancer of those cells, those mesothelial cells, it is mesothelioma." Trans. at 1383. Professor Brody stated, "[A]ll of the asbestos fiber types can cause mesothelioma . . . they all are perfectly good carcinogens." Trans. at 1384. He observed that no safe level of asbestos exposure has ever been established and that "[t]here is no level below which we know it to be absolutely safe and will not cause mesothelioma." Trans. at 1429.

24

One of the more insidious aspects of this fatal disease is the fact that its symptoms suddenly appear often decades after a worker is exposed to asbestos. Regarding this latency period between the exposure to asbestos and the first appearance of symptoms of malignant mesotheliomas, Dr. Brody testified that the probability for the latency period to be less than 10 years is about zero; for latency periods of 10 to 14 years about 0.5%; for 15 to 19 years, still just about 3%; and for 20 years or more, 96%. Dr. Brody agreed with an estimate that the average period in these cases from initial exposure to death is about 32 years. Trans. at 1480-82.

The Court specifically notes the testimony of Dr. Michael Ellenbecker emphasizing that "when we're talking about mesothelioma, I think it's difficult to do any activities with asbestos where you completely eliminate the hazard." Slip op. at 10, quoting Tr. at 2538. Asked whether there is any safe level of exposure to asbestos in the context of the risk of developing mesothelioma, Dr. Eugene Mark answered, "I don't think there is any safe level." Tr. at 2021. Likewise, Dr. Edwin Holstein testified that there is no recognized safe level of exposure to asbestos insulation such that no mesothelioma would occur in insulation workers. He explained, "There may be such a level at very, very, very low levels, but we don't know what it is. What we do know is that even very small exposures have caused mesothelioma in some people." Tr. at 1559. In fact, the Court itself acknowledges that "it is clear that working with any level of asbestos can be associated with mesothelioma." Slip op. at 13.

Thus we see that asbestos workers are extraordinarily susceptible to this insidious and virulent disease that will usually go undetected for decades but then suddenly erupt with devastating and almost inevitably fatal consequences. Elimination of this enormous risk is virtually impossible because it requires preventing every possibility of asbestos workers inhaling any asbestos fibers.

Conceding that working with asbestos can be perilous, the Court nevertheless concludes that the work does not qualify for the intrinsically dangerous exception to the rule of subcontractor nonliability because, although dangerous, "proper precautions can minimize the risk of injury." *Id*. at 11. As authority for this conclusion, the Court cites <u>Carie v. PSI Energy, Inc.</u>, 694 N.E.2d 729, 735 (Ind. Ct. App. 1998). <u>Carie</u> found the intrinsically dangerous

25

exception inapplicable, noting that "[t]here is nothing intrinsically dangerous about generating station maintenance in and of itself," that the accident was caused by the collateral negligence of others, and that "proper precautions were not taken during the cover removal process." *Id*. at 734. Elaborating on the last point, and citing earlier opinions of the Court of Appeals, the court declared that "[a]n instrumentality or undertaking is not intrinsically dangerous if the 'risk of injury involved in its use can be *eliminated* or *significantly* reduced by taking proper precautions,'" and explained that "[t]he proper inquiry is whether the taking of proper precautions would *significantly* reduce or *eliminate* the risk of injury." *Id.* at 735 (emphasis added). [1] The emphasized words, in my opinion, are of crucial importance. Otherwise this "proper precautions" rationale would conflate the "intrinsically dangerous" exception with the "due precautions" exception and thus eviscerate the "intrinsically dangerous" exception altogether.

An intrinsically dangerous activity, also referred to as an "abnormally dangerous activity" in the Restatement of Torts, Second § 520, is therein explained as follows:

> In determining whether an activity is abnormally dangerous, the following factors are to be considered:
> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

This analysis requires the full inability to *eliminate* the risk, not merely to significantly reduce it. In my view, this is preferable to the prevailing Indiana appellate view that the intrinsically dangerous exception does not apply to risks that cannot be "significantly reduced."

Even applying the view that the intrinsically dangerous exception is applicable where risks either cannot be eliminated, or *significantly* reduced by due precaution, it appears clear that the risk of contracting mesothelioma demands that working with asbestos still be deemed

_____

[1] We granted transfer, vacating the Court of Appeals <u>Carie</u> opinion, <u>Carie v. PSI Energy, Inc.</u>, 715 N.E.2d 853, 858 (Ind. 1999), but "summarily affirmed" by footnote as to the intrinsically dangerous exception issue.

intrinsically dangerous. As noted above, the Restatement cites the escape of lions and urban blasting as examples of abnormally dangerous activities. Obviously, such risks can be somewhat reduced with due precaution, but they cannot be eliminated or even *significantly* reduced. So it is with asbestos.

The Court today asserts only that "precautions could have minimized Roberts's exposure to asbestos" to justify its conclusion that "working with asbestos is not intrinsically dangerous." Slip op. at 11. But *minimizing* is not enough. Not only must due precautions have "minimized" the risk; they must have been able to *eliminate* or *significantly* reduce it. The risk of asbestos workers contracting mesothelioma cannot be eliminated nor significantly reduced. It is the quintessential example of an intrinsically dangerous activity.

Summarizing its conclusions, the Court concludes part I in part by stating that "Roberts has no claim against PSI for activities of ACandS as PSI's independent contractor because (a) the injuries he suffered came from a situation he was employed to address, (b) asbestos is not 'inherently dangerous' as that term is used in the exception to nonliability for acts of independent contractors, . . . " *Id*. at 14. It is my view that rationale (a) disregards precedent. Moreover, it is too broad and may be misapplied to any and all claims of injury to employees of subcontractors even when any one of the five recognized exceptions are clearly applicable. As to rationale (b), I strongly believe it fails to recognize the fact that working with asbestos is an intrinsically dangerous activity, the responsibility for which the principal may not delegate to a subcontractor.

In part II, the Court acknowledges the duty of a property owner to "maintain the property in reasonably safe condition for business invitees including independent contractors and their employees." *Id*. at 14. However, emphasizing that asbestos removal was the reason Roberts was on the PSI premises, the majority opines that the law does not support Roberts's claim "to the extent it is based on PSI's knowledge of asbestos on the property and awareness that ACandS was not requiring safeguards." *Id*. at 16. In a significant amplification of premises liability jurisprudence, the Court today announces that, henceforth, where the invitee is the employee of an independent contractor employed to remedy a dangerous condition, the occupant/owner's knowledge should be compared with that of the independent contractor, not merely the

27

knowledge of its employee. This new rule alone should significantly provide the protection sought by the majority for the use of independent remediation contractors without the additional measures taken by the majority that I believe generally assault and undermine important principles of owner/principal liability and its resulting enhancement of construction worker safety.

I believe, however, that this innovation is detrimental to more important and established principles of responsibility and accountability in tort. The Restatement of Torts (Second), § 343 recognizes that a "possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land" only if the possessor knows or should discover and realize that it "involves an unreasonable risk of harm," should expect that "they will not discover or realize the danger, or will fail to protect themselves against it," and then fails to exercise reasonable care to protect the invitees from the danger. The word "they" refers to the injured invitee, not the invitee's employer. This obligation is qualified by Section 343 A(1), which states that the possessor is "not liable to his invitees" for injuries caused "by an activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*" (emphasis added). Section 343 A(1) thus allows accommodation for the very concern that permeates the majority opinion. Where a possessor employs an independent contractor with respect to activities or conditions on the land known or obvious to persons thereby coming onto the land, the possessor will have no liability except in those extraordinary circumstances where the possessor should anticipate harm notwithstanding the obviousness of the risk. The Restatement is clear, however, that in the latter situation, the possessor remains accountable. These principles have long been recognized. Professor Prosser explains:

> [W]here a condition is one . . . which cannot be negotiated with reasonable safety even though the invitee is fully aware of it . . . the jury may be permitted to find that obviousness, warning or even knowledge is not enough. It is generally agreed that the obligation as to the condition of the premises is of such importance that it cannot be delegated, and that the occupier will be liable for the negligence of an independent contractor to whom
> he entrusts maintenance and repair.

William L. Prosser, Law of Torts § 61, p. 394-95 (1971). I am opposed to the majority's new rule, permitting a landowner to abandon to independent contractors all responsibility for the risk

28

of harm to invitees from extremely dangerous conditions on the land, thus undermining the foregoing well-established principles of responsibility and accountability under tort law.

Even with the majority's modification of the rule to provide special protection to principals employing certain independent contractors, it must be recognized that there is a limit to the landowner's reasonable reliance on the contractor. Pursuant to § 343 A of the Restatement, other courts have held that a landowner may be liable for an independent contractor's injury by dangers from known or obvious conditions if the landowner should have realized the risk that the contractor would not protect itself or its employees despite the obvious nature of the danger. For example, in Miller v. Zep Manufacturing Co., 815 P.2d 506 (Kan. 1991), an employee was injured when he fell into a concrete pit on the landowner's property. The court affirmed a jury finding in favor of the employee, reasoning that the evidence was sufficient for the jury to find that the landowner should have anticipated and prevented the risk. *Id.* at 515. In Watkins v. Mt. Carmel Public Utility Co., 519 N.E.2d 10 (Ill. App. Ct. 1988), the plaintiff worked processing crude oil stored in two large tanks constructed near an uninsulated power line. He was injured when an aluminum pole he was carrying while walking on a catwalk above the tanks touched the power line. *Id.* at 11-12. The trial court dismissed the complaint, but the Illinois Court of Appeals reversed, holding that it is a jury question whether the defendant should have anticipated the risk of injury despite the obviousness of the danger. *Id.* at 13. In Boatwright v. Sunlight Foods, Inc., 592 So.2d 261, 263 (Fla. Dist. Ct. App. 1991), an employee of an independent contractor was fatally injured in a fall from a negligently designed vinegar tank. Based on evidence that the owner designed the tank and knew of the danger, but refused to install a guardrail, the court reasoned that the jury could find the owner negligent. *Id.*

I respectfully contend that the Court today employs unnecessary draconian methodologies to provide protection for landowners and other entities that employ independent contractors to eliminate or ameliorate dangerous conditions. Except for genuine intrinsically dangerous activities, such interests already receive significant protection under the "due precautions" exception and Restatement § 343 A(1). More significant, I submit, is the constraint intrinsic to the comparative fault allocation system itself. In the present case, for example, the jury allocated thirteen percent fault to PSI, twelve percent fault to Roberts, thirty-six percent

fault to nonparty ACandS, and the remaining fault to other nonparties.  This shows clear recognition of the significant role of the independent contractor, ACandS.  And apart from this case, where the landowner was shown to have independently contributed to substantially increase the risk to the worker, other cases will very likely result in an even greater allocation of fault to the independent remediation contractor.  Justice is better served by trusting the sound judgment of civil juries than by erecting protective judicial doctrines.-

Notwithstanding my disagreements with much of the Court's discussion today regarding liability for injuries to employees of independent contractors, I concur with its conclusion that the evidence in this case was sufficient under the instructions to sustain the jury's verdict and the trial court's judgment.  For these reasons, I concur in result.

Rucker, J., concurs.